**CITY OF WEST ST. PAUL,**
**Petitioner, Appellant,**

v.

**LAW ENFORCEMENT LABOR**
**SERVICES, INC.,**
**Respondent.**

**No. CX–90–1349.**

Supreme Court of Minnesota.

Feb. 14, 1992.

Arnold E. Kempe, West St. Paul, for appellant.

Marylee Abrams, Bloomington, for respondent.

Carla J. Heyl, League of Minnesota Cities, St. Paul, for Amicus Curiae League of MN Cities.

Edward N. Mansur, Mansur, O'Leary & Gabriel, P.A., St. Paul, for Amicus Curiae MN Police & Peace Officers Assoc.

COYNE, Justice.

We granted the petition of the City of West St. Paul for review of the court of appeals' decision affirming the award of summary judgment to Law Enforcement Labor Services, Inc., in a declaratory judgment action brought by the city against the union. The dispute is a labor contract dispute over the city police department's ride-along programs. The city and the union in their negotiations of the labor contract for

1989 resolved all issues except a dispute over the union's demand for a provision to the effect that "no one but licensed full-time Police Officers will accompany Patrol Officers without the express written agreement of the officer, all other jurisdictional issues aside." The district court, granting the union's motion for summary judgment, ruled that the city was free to establish a ride-along program but that it was obligated to negotiate the implementation of the policy to the extent the policy affects the working conditions of the officers. The court of appeals affirmed. *City of West St. Paul v. Law Enforcement Labor Services, Inc.*, 466 N.W.2d 27 (Minn.1991). We affirm in part and reverse in part.

The city is a municipal corporation and public employer within the meaning of Minn.Stat. § 179A.03, subd. 15 of the Public Employment Labor Relations Act (PELRA), and the union is a Minnesota corporation and the exclusive representative of the police officers, Minn.Stat. § 179A.03, subd. 8 (1990).

The city maintains various programs in which persons who are not licensed police officers ride in police cars. One such program is the Explorer Scout ride-along program, which the city has maintained for approximately 10 years. Explorer Scouts are young men and women from 15 to 21 years old who ride with police officers and assist the officers with crime prevention, record-keeping and radio and telecommunications operations. The program is intended to foster interaction between young people and the police and to encourage young people to consider careers in law enforcement. Before riding with officers, the Explorer Scouts must complete one year of training in first aid, crime prevention, issues relating to domestic abuse, and firearms use (although they do not carry guns). Each Explorer Scout accompanying the police wears a uniform similar to an officer's uniform and is permitted to carry a nightstick, a can of Mace, handcuffs, radios, and a utility belt. They are insured by Boy Scouts of America and sign waivers relieving the city of liability for them. Another ride-along program requires police officer trainees working as interns to ride along with police officers. Police dispatchers and community service officers also occasionally accompany police officers.

The dispute in this case surfaced in the fall of 1989 when the union demanded a contract provision to the effect that "no one but licensed full-time Police Officers will accompany Patrol Officers without the express written agreement of the officer, all other jurisdictional issues aside." The city refused to negotiate this proposed addition to the contract when the issue was certified for interest arbitration. Instead, it instituted this action for declaratory judgment, arguing that the clause concerned a matter of inherent managerial policy and that, therefore, the city had no obligation to negotiate it.

PELRA is intended to "promote orderly and constructive relationships between all public employers and their employees" by granting public employees certain rights to organize and choose representatives, requiring negotiation between public employers and their employees in appropriate circumstances, and establishing special rights, responsibilities, and procedures. Minn. Stat. § 179A.01. To effectuate that purpose, Minn.Stat. § 179A.07, subd. 2 imposes upon the public employer the "obligation to meet and negotiate in good faith with the exclusive representative of public employees in an appropriate unit regarding grievance procedures and the terms and conditions of employment, * * *." However, the public employer's duty to negotiate is not absolute: "A public employer is not required to meet and negotiate on matters of inherent managerial policy." Minn. Stat. § 179A.07, subd. 1.

 As we have said before, the distinction between "terms and conditions of employment" and "matters of inherent managerial policy" is "far from distinct." *University Education Association v. Regents of University of Minnesota*, 353 N.W.2d 534, 539 (Minn.1984). It is true, of course, that some decisions by the public employer fall squarely within the province of inherent managerial policy. Whenever that is so, we must give effect to section

179A.07, subd. 1, and hold that such a policy decision falls outside the scope of mandatory arbitration. *University Education Association*, 353 N.W.2d at 539; *St. Paul Fire Fighters, Local 21 v. City of St. Paul*, 336 N.W.2d 301, 302 (Minn.1983). More often, inherent managerial policy decisions in some way affect the terms and conditions of employment. We have held that where the policy decision and its implementation are so inextricably intertwined that negotiation of one would be tantamount to negotiation of the other, the policy decision is not subject to mandatory bargaining. *See, e.g., Law Enforcement Labor Services, Inc. v. County of Hennepin*, 449 N.W.2d 725, 727–29 (Minn.1990) (establishment of grooming policy for sheriff's department personnel and implementation of policy are inseparable). If, however, the establishment of a policy and the implementation of the policy are severable, then the implementation of the policy is subject to mandatory bargaining with respect to the direct effect of the policy on the terms and conditions of employment— but only "to the extent that negotiation is not likely to hamper the employer's direction of its functions and objectives." *St. Paul Fire Fighters, Local 21*, 336 N.W.2d at 302 (establishment of training program in which all fire captains, including veteran fire captains, must participate is a policy decision but certain aspects of the implementation of policy directly affecting terms and conditions of fire captains' employment are severable and are appropriate subjects for negotiation).

█ We have no difficulty, at the outset, in concluding that the decision to establish a particular ride-along program is generally a discretionary policy decision not subject to mandatory bargaining. It is also clear that the implementation of such a policy affects or has an impact on the terms and conditions of employment of the officers.

█ The question then becomes whether the establishment of the policy and its implementation are so inextricably intertwined that requiring negotiation would require the employer to negotiate the basic policy decision or whether the establishment and the implementation are severable, making the details of implementation negotiable to the extent negotiation will not likely hamper the establishment of the policy. We believe that the answer to this question differs depending on which of the several ride-along programs is the subject of dispute.

There is a great difference, for example, between a ride-along program for those people who are training to become licensed police officers and a ride-along program such as the Explorer Scout Program. In order to properly train a police intern "in the field" in a ride-along program, it is necessary that the employer retain considerable flexibility in implementing the policy or program. On the other hand, the city's or the employer's interests with respect to an Explorer Scout ride-along program are, it seems to us, of a distinctly different nature; and it is not clear, in the abstract at least, that the employer needs to retain as much flexibility in the implementation of such a program in order to insure the success of the program.

█ We use the phrase "in the abstract" designedly because this issue comes before us not at the bargaining table but rather in the context of summary judgment in a declaratory judgment action. Accordingly, we do not have the sort of factual record relating to the programs which would allow us to determine the extent to which the implementation of the Explorer Scout ride-along program or community service volunteer ride-along program is subject to mandatory bargaining. The record does, however, compel these conclusions:

1. The city has general inherent discretionary authority to establish ride-along programs.

2. The union's proposed contract provision which precipitated this litigation is not a provision which is subject to mandatory negotiation. As a matter of law, no arbitrator could require the city to agree to such a provision because it would impermissibly leave the implementation of the policy subject to utter frustration at the whim of each individual officer.

3. On this record, at least, the implementation of a ride-along program for those people training to become licensed police officers appears so inextricably intertwined with the establishment of such a program that a decision requiring the city to meet and negotiate the implementation likely would amount to the usurpation of the city's role as policy maker by requiring the city to negotiate with respect to the basic policy decision.

4. On the other hand, on this record it appears that the implementation of other ride-along programs, such as the Explorer Scout Program and other community volunteer programs, may well be sufficiently severable from the discretionary decision to establish such programs as to leave room for some negotiation to the extent the policy directly affects a term and condition of employment and to the extent negotiation is not likely to hamper the city's direction of its functions and objectives.

We reiterate that this court's role is not to take sides in labor disputes between public employers and public employee unions. Ours is a limited role, undertaken with considerable reluctance, of making a good faith effort to interpret and apply the rather general language chosen by the legislature to define what is subject to mandatory bargaining and what is not subject to mandatory bargaining.

Affirmed in part, reversed in part.